Mr. Taylor, coming from the other direction, when he's ready. One second, Your Honor. Good morning again. Morning. You have less time, this case. Here, of course, we are speaking about the same patents. And in this instance, I want to point out a number of ways that the court made some of what we consider serious mistakes in how it addressed the infringement evidence and the legal concepts regarding claim construction as it applied to the Mylan product. This case is basically about whether talc is an alkaline reacting compound, right? In our view, Your Honor, it's about whether the calcium carbonate in Mylan's talc is an alkaline reacting compound. What the court did was apply a different and more stringent claim construction when it looked at the facts with regard to the Mylan product and whether that product contained an alkaline reacting compound that it did for any of the now many products that Astra has asserted these patents on. And many of those cases have found its way to this court. An alkaline reacting compound is a material that basically meets three criteria. It is a material that has a pH of greater than seven in water. And it stabilizes the ameprazole in the core by creating a micro pH of greater than seven in the core with that ameprazole. And you have an extensive listing in your patents of alkaline reacting compounds. And talc is not included. It is not and has never been. And talc is listed elsewhere in the patent, so it wasn't forgotten. Talc was listed as an ordinary excipient in that. It has never been and it is not now Astra Zeta's contention that the talc is the alkaline reacting compound. But you're saying there was calcium carbonate in the talc. It's the calcium carbonate in the talc. So you kind of wave away the talc as being irrelevant. Well, the talc is relevant in that that is how Mylan chose to introduce the alkaline substance into its formulation. So all this discussion about whether talc was disclaimed, whether it is an ordinary excipient, is in some way a diversion from addressing the real issue. Well, did AstraZeneca prove that the talc contained calcium carbonate? Fact question. Fact question. And we have hundreds of pages of an opinion here with expert testimony and the court decided this fact. The court did decide this one, but to assess this one, you don't really need to look at that much testimony. There's a couple of things that bear pretty closely on whether AstraZeneca proved that this product contained calcium carbonate. AstraZeneca's expert, Dr. Davies, tested the talc, Mylan's talc, and his test showed that there was calcium carbonate in the product. He identified it chemically in a number of different ways, and those tests were not refuted by any other test on the product of Mylan. Now, Mylan did submit test results on the talc that it uses that was done by its manufacturer. Now, those results didn't show that there was no calcium carbonate in the formulation. What it showed was that the calcium carbonate was not detectable. There was a 2% detection limit with regard to that test. So what did the court do in weighing that evidence? The court said it was inconclusive. Well, that is legal error. That's the wrong standard. Well, at best, the evidence properly weighed showed that there was, at a minimum, small amounts, less than 2%, of calcium carbonate in the talc. We believe that it was legal error for the court to apply an inconclusive standard to this evidence. Well, conclusive simply means that you didn't carry a burden of proof to show by a preponderance of the evidence. Why is inconclusive so inconclusive a term? Well, they mean really two different things with all due respect. Well, I don't think Judge Jones was confused about the proper standard. I mean, she sprinkled throughout the 385 or however many pages of opinion here. It seems to me that to seize on the word inconclusive and say, aha, this is a different standard, is really ignoring the fact that she made very clear that she understood the standard and applied it throughout. That seems to me a non-starter. It was not our intent to seize on that statement. But looking at that statement in connection with the evidence, the facts that were presented on this issue, it's a way of explaining how the court came to the improper factual determination. If you look at this evidence, and again, the only evidence presented was that there was talc. It was identified chemically by Dr. Davies using very sophisticated techniques. And the only contrary evidence was that it was not detectable by a test that only would detect more than 2% of talc in the material. So if that's the only evidence, which it is, it is clearly erroneous for the court to have come to the conclusion that AstraZeneca had not proven that the talc contained carbonates. And there's other evidence that the talc contained carbonates. For example, there's no question that the pH of the highly alkaline talc that Mylan uses is greater than 7. Now, the pH in that material is due to the presence of carbonates. Talc ordinarily, absolutely pure talc, is a inert and neutral material. Without something in it to raise the pH, the pH would have been absolutely neutral. So there is other evidence that Mylan's talc contains carbonates, including the specification that Mylan gets from its supplier. It requires that its talc be alkaline. So all of those facts certainly are more than the preponderance of the evidence. All of those facts, in our view, should have led the court to conclude that AstraZeneca had medicated on this issue. So when we latch on and refer to the word inconclusive, I mean, we of course can't know or don't know how the judge weighed this evidence. But when she used that term in connection with weighing this evidence and came to this conclusion, I believe it was reasonable to conclude that that was a legal error in her applying the wrong standard to these clear facts. There was a second error that we also think the court was led to in part because of her focus on this carbonate being an impurity in the talc. AstraZeneca showed, in our view, that the micro-pH in the Mylan core had a pH greater than 7. And therefore, the omeprazole was stabilized. Just to give a little background, the patent talks about stabilizing omeprazole by mixing it with an alkaline reacting compound. If you look at Column 1 of the patent, for example, it discloses that omeprazole is unstable in acidic environments and more stable in alkaline environments. So one of the first things that the inventors did was to mix omeprazole with these alkaline reacting compounds. And they found that when you got to a micro-pH of greater than about 7, you stabilized the omeprazole. So the stabilizing of omeprazole is the intended result and the result of a micro-pH of greater than 7. Now, for everyone else besides Mylan, the court was satisfied that AstraZeneca met its burden to show the presence of an alkaline reacting compound simply by the showing that they added an alkaline material and that material resulted in a micro-pH of greater than 7. And of course, that thereby stabilizes omeprazole. For Mylan, the court required more. The court said, no AstraZeneca, you have to prove, presumably through some comparative testing, that the ARC, this formulation, with or without the alkaline reacting compound, it's more stable with it than without it. You're into your rebuttal time, which you can save or use as you wish. Your Honor, I think I will save the time, but I just wanted to follow up on that point, which is the second error was that only for Mylan did the court require proof of separate stability in the final formulation and did not credit the showing of micro-pH as satisfying the stability requirement and the effective amount requirement of alkaline reacting compound limitation. Thank you. Thank you, Your Honors. Good morning. Your Honors, a plain reading of the patent would show that ordinary talc is not considered an ARC by the patentee. As Your Honor, Judge Lurie pointed out, they mentioned a whole bunch of ARCs and they mentioned talc. And it's interesting, if you look at example one of the patent, they have various formulations with different cores to show which kinds of ARCs are effective and which ones aren't. The interesting part of that example is core number one is a control, which they have said repeatedly around the world does not contain an ARC. But guess what is in the active ingredient of that core? Talc. But if talc has a certain amount of alkaline reacting compound in it, why then, even if it enters by virtue of the talc, if it's there, isn't there infringement? There are several aspects of that question, Your Honor. And by the way, their brief says that Judge Jones said if it comes in by accident as an impurity, it can't be an alkaline reacting compound. She said precisely the opposite. She said that is an open possibility. And she examined the evidence with that contention in mind. And here's the thing, Your Honor. The leading expert from Astra, Dr. Robert Langer, a very well-known scientist, admitted that all talcs have impurities. And myelin's talc, Astra's talc, they've all got impurities. The question is, what's in them? First, plaintiffs offered evidence of Dr. Davies where he said he found carbonates in the talc. Judge Jones weighed that against non-litigation evidence from the supplier of the talc. It could not find carbonates detectable. Non-litigation evidence from the manufacturer of myelin pellets, Laboratory's Dr. Estava, where they found no evidence of carbonates. But then she took it one step further. She said, whatever may be in the raw bag of talc, what's required? We're talking about a formulation claim. We're talking about, just as Mr. Taylor said in the situation with the in-situ separating layer, we're talking about what is in the final product. It is interesting, and Judge Jones gave great weight to the fact that Astra, after having spent $10 million on tests of the various defendants' products, just in this wave of the case, with the most sophisticated scientific instruments available, including things I'd never heard of before this case, one of them I call the super sniffer because it can detect things down to parts per fraction of a billion, they offered no evidence as to whether these carbonates, even if they had been present in the starting talc, did these carbonates make it to the final product. No evidence offered whatsoever. And as this court pointed out in the first wave case, you cannot infer the presence of an arc from pH testing alone. You have to prove that the arc is in the active core layer. They did not offer that evidence, complete failure of proof. On the micro pH testing, there are two things that should be considered here. Judge Jones heard from our expert, Dr. Richard Durst, who was perhaps the world's most renowned pH testing expert. For many years, he was the guardian of the United States pH standard at the National Bureau of Standards. Dr. Durst testified that to the extent there's an impurity in there, when you're trying to prove the pH of an impurity, if you load up your test, as Dr. Davies did, with chiseling off 20 or 30 or 40 different pellets, that will amplify and distort the result, and that's not a valid pH test to measure that. Now, we do have in this case agreement between the parties that there is a test that the court should look at as far as the pH of what's in the final product. If you look on page 14 of our brief, you'll see our active core region consists of the active ingredient, the meprosol, HPMC, and talc. Those three, and the way the myelin, in contrast to the ASPR product and what's in the patent, the way the myelin stubble product is created, it's on a fluid bed process. It's not one of these extrusion things where you chop them up and bang them, and you really have a lot of leakage when you finish with the product. They start with the sugar pellet, and then they spray coat them. It takes hours and hours to spray coat them. You get a very uniform, elegant product, and so in the myelin product, the subcoat protective layer is very large. It's 45 microns. But both sides agreed that a relevant test of the pH of what's in the active ingredient should be a measure of the suspension of what's called film coat number one. That's where we pour into water the meprosol, the talc, and the HPMC. And ASPR relies on tests of that, and they said, ah, Dr. Stubble found it was 7.1, I think it was, therefore it's alkaline. What they failed to tell the court is that in 2002, when we realized that they were relying on that test, and they relied on it as late as their briefing in the Federal Circuit, that we looked at the ingredients that were going into that core. Again, the meprosol, couldn't change that, the talc, and the HPMC. And we found that the specification on the HPMC allowed it to be anywhere from 5.5 to 8.0. So what is causing this above 7 pH in film coat number one? And it was very easy to change the specification of the HPMC and say, we're not going to use bags of HPMC which have a pH more than 6.3. And so that was the manufacturing spec that was adopted. That's what was used for the commercial product. Dr. Durst, using film coat number one as defined by the specification, measured the pH of film coat number one, and it was consistently slightly acidic. Dr. Jones weighed this evidence. She weighed the fact that they were relying on a pH test of film coat number one for the pre-commercial product. And Dr. Durst was relying on the pH of film coat number one for the actual newly defined in 2002 product that was going to be sold commercially. And certainly it's not clear error to say that Judge Jones, following the test of the product that's actually being sold in the market, is more appropriate than a test on a product that never hit the shelves of the store. The claims clearly require that not only there be an arc, not only there be a micro pH, but it also has to be an effective amount of the arc. And this is not something Judge Jones dreamed up. It's right there expressly in the claim. It must be an effective amount of the arc, not some stray amount. Astra points to some stability studies that Dr. Estava did, which Astra contends show that, and what Dr. Estava did is they made up some test product where they took the talc out of the core portion of the pellet. Actually, it's not so clear what effective amount refers to. Effective amount of material selected from the group consisting of a naprazole plus an ARC. That's a good point, Judge Laurie, but Judge Jones ruled that effective amount modifies both and the federal circuit in the first wave expressly affirmed on that basis. And that, as I understand it, AstraZeneca is not contesting it after 10 years of litigation. So as I say, Dr. Estava made up these test pellets where they deliberately withheld the talc from the active ingredient core to see how stable they would be. And Astra points to certain studies and says, ah, this shows when you take the talc out, it's not stable. Well, there are several problems with what Astra is pointing to, and Judge Jones caught on to it right away. The first is they truncated the data. They only looked at the first three months of the data. And second, they looked more at the data of a pilot plant rather than the commercial plant. But most significantly, and if you look on page 14 of our brief, we have side by side for you the so-called European pellet and the myelin pellet, sometimes known as the French pellet. The European pellet is lacking a layer that is contained in the French and the myelin layer. There is an extra layer put in for control release purposes to slow down. This was a very difficult product to get bioequivalence on, and they put in an extra layer. And Judge Jones pointed out, most emphatically, that the data on the experimental pellets that Astra was relying on were the three-layer European pellets, never been sold in the United States, not subject to this lawsuit. Again, they're relying on data for something that's not subject to the lawsuit. But Judge Jones additionally pointed out, if you look at that European data correctly, if you look at the totality of the data on the commercial plant, it does show that taking the talc out doesn't act negatively on the preservation of the product. But more importantly, she turned to the data that Dr. Estava, and I should point out one other thing, Astra points out in its brief, ah, well, Dr. Estava and other litigation relies on this data from the three-layer pellets. Well, of course, because there are litigations in the UK and Germany and other places where they actually sell those products. But Judge Jones looked at the data that Dr. Estava did for the French pellets, which were equivalent to the myelin pellets, with the four layers, and she concluded that that showed that there was, that even if talc or the carbonates from talc were in the core, it was not acting as an effective amount of an arc because it simply made no difference. The pellets were perfectly fine with or without the talc, and therefore there is no evidence of an effective amount of the alleged arc. Thank you, Mr. Wallace. Thank you, Your Honor. Taylor has a few minutes left. Thank you, Your Honor. Mr. Wallace said that there was no evidence that the carbonates actually made it into the formulation with the talc. We take issue with that characterization for a number of reasons. First, it is evidence that the carbonates got into the formulation by proving that the talc with the carbonates was put into the formulation. Now, it's just as persuasive as if I put a dollar in my pocket and walk from outside and inside, you don't have to check me again for the dollar to have the preponderance of the evidence that the dollar went into the building with me. Now, myelin presented no evidence with regard to its processing or anything else that it did. It presented no evidence to suggest that the carbonates would be removed from its talc in its processing. And there's evidence that the talc with the carbonates remain in its final product. And what is that evidence? It's the pH testing of the core. And that evidence is there even if you look at myelin's test, which resulted, we think erroneously, in a pH slightly less than 7. Well, pure omeprazole has a pH of 6.4. If there was not an alkaline substance in the core with the omeprazole, that core should have a pH of 6.4. If you look at myelin's test and you look at AstraZeneca's test, both those sets of tests are significantly greater than 6.4. Now, myelin says they relied on a test that, you know, Astra did and myelin did. Well, the test that they're talking about was done by both AstraZeneca and myelin. But the test that Astra relied on to show micro pH wasn't that test. It's the test that was described in the patent at column 3, taking a small amount of the omeprazole-containing region, adding it to a small amount of water, and testing the pH. Now, that's the high-concentration test that myelin refers to and says that we've done the wrong test. It's the test the patent says to do. And it's the test that AstraZeneca used to prove infringement of every other defendant that has been in both the first and second wave cases. And finally, Your Honor, you know, I totally disagree with the characterization of these stability testing. And that's set out in our brief, our view on tests. But I want to close with saying that if you look at what myelin does and you look at how much talc is in their foreign product, you can see that somewhere in the neighborhood of 1,600 or more grams of talc is added into each batch of their product. And you can go to record page A81732 to see a representative myelin batch record. Let's assume that myelin's tests on its talc were correct and there were less than 2% of carbonates in the talc. If we had a product where myelin simply added 30 or 40 grams of carbonate to their batch, mixed it and formulated it, we wouldn't be arguing about stability tests done overseas. We wouldn't be arguing about many of the things that the judge considered for myelin that it didn't consider for any other defendant. Thank you, Your Honor. Thank you, Mr. Taylor. The case will be taken under advisement.